FILED

2010 Sep-30  PM 04:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| DANNY MOULDS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 2:04-cv-3443-SLB-TMP |
| | ) | |
| STEPHEN BULLARD, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

This case is before the court on remaining defendants Barber, Eads, Richburg and Bullard's second Motion for Summary Judgment.  (Doc. 71.)[1]  Upon consideration of the record, the submissions of parties, and the relevant law, the court is of the opinion that defendants' Motion for Summary Judgment is due to be granted.

## I.  PROCEDURAL HISTORY

On December 14, 2004, the plaintiff, Danny Moulds, filed a *pro se* complaint pursuant to 42 U.S.C. § 1983, alleging that rights, privileges or immunities afforded him under the Constitution or laws of the United States had been abridged during his incarceration at W.E. Donaldson Correctional Facility ("Donaldson") in Bessemer, Alabama.  (Doc. 1.)  Moulds asserted the following claims: (1) deliberate indifference to a known risk or danger to

---

[1] Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

plaintiff's safety in violation of the Eighth Amendment; (2) deliberate indifference to cruel and unusual confinement conditions; (3) retaliation for the exercise of First Amendment rights; (4) denial of access to the courts; and (5) denial of the right to call witnesses at a disciplinary hearing in violation of his Fourth Amendment right to due process. (Doc. 11 at 2.) Moulds named as defendants former Alabama Department of Corrections Commissioner Donal Campbell, former Donaldson Warden Stephen Bullard and Corrections Officers John Arthur, Alphonso Barber, Ronald Carter, Trenton Eads, Jimmie Richburg, and fictitiously named "John Doe" corrections officers. Plaintiff seeks monetary, declaratory, and injunctive relief.

In accordance with the usual practices of this court and 28 U.S.C. § 636(b)(2), the complaint was referred to a magistrate judge for a preliminary report and recommendation. On December 12, 2007, the magistrate judge filed a report and recommendation, recommending that summary judgment be granted to defendants on all claims. (Doc. 43.) This court adopted the magistrate judge's report and accepted his recommendation, granting summary judgment to all defendants and dismissing plaintiff's action with prejudice. (Doc. 50.) Moulds appealed the grant of summary judgment. (Doc. 53.)

On September 16, 2009, the Eleventh Circuit Court of Appeals issued an unpublished per curiam decision affirming in part, reversing in part, and remanding the case back to the district court. (Doc. 66.) Specifically, the court of appeals reversed the district court's grant of summary judgment with respect to Moulds's due process claim arising out of the denial

of witnesses at his disciplinary hearing and affirmed the grant of summary judgment in all other respects.  (*Id.* at 21.)  The case was remanded to this court for further proceedings. (*Id.*)

On November 20, 2009, the remaining defendants Barber, Eads, Richburg and Bullard filed a second Motion for Summary Judgment on the remanded procedural due process claim, (Doc. 71), and Moulds filed a response on December 10, 2009 (Doc. 72).  The magistrate judge filed a report and recommendation on June 29, 2010, recommending that the Motion for Summary Judgment be granted with respect to defendant Richburg but denied as to the remaining defendants Barber, Eads and Bullard.  (Doc. 81.)  While noting that a forceful argument could be made that the appellate decision is "clearly erroneous," the magistrate judge denied defendants' second Motion for Summary Judgment on the basis that the error would not cause "manifest injustice."  (*Id.* at 16, n.7.)

All four defendants objected to the report and recommendation on July 14, 2010 (Doc. 82), and Moulds responded to the objections on July 21, 2010 (Doc. 83).

## II. <u>SUMMARY JUDGMENT STANDARD</u>

Under Federal Rule of Civil Procedure 56(c)(2), summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).

### III. **STATEMENT OF FACTS**

In his report and recommendation, (Doc. 81), the magistrate judge set forth the following statement of facts:

> Applying the [summary judgment standard], the following facts appear to be undisputed or, if disputed, are taken in a light most favorable to the non-moving plaintiff. [Footnote]
>
> > [Footnote: Following remand to this court, the only issue is whether plaintiff's right to procedural due process of law was violated by the denial of the opportunity to call witnesses in connection with his prison disciplinary hearing. While the evidentiary materials submitted previously by plaintiff have been considered, only those portions relevant to the due process issue are recited here. The principal evidentiary materials supplied by plaintiff are his April 1, 2005, amended complaint (Doc. 11), which replaced and supplanted the original complaint; his February 8, 2006, response to defendant's first motion for summary judgment (Doc. 25); his February 9, 2006, affidavit in support of his complaint (Doc. 30); his April 13, 2006, opposition to summary judgment (Doc. 39); and, his December 10, 2009, response to defendant's second motion for summary judgment (Doc. 72).]
>
> After being stabbed by a fellow inmate, plaintiff declared his intention to file a lawsuit alleging that the guard staff at Donaldson Correctional Facility failed to protect him from harm. On October 25, 2004, defendant Sergeant Carter went to plaintiff's cell to conduct a shakedown search. He seized all of the plaintiff's "legal work," including research and affidavits related to the proposed lawsuit.
>
> On October 31, 2004, defendant corrections officer Barber came to plaintiff's cell to serve him with five disciplinary notices, charging him with bribery or attempted bribery (Rule 60), conspiracy (Rule 91), creating a security hazard (Rule 62), making false statements (Rule 41), and possession of contraband (Rule 64). (Doc. 25, p. 11). Plaintiff refused to sign the notices, but told Barber that he wanted witnesses at the disciplinary hearing. Barber failed or refused to note the witnesses on the notice forms and, when plaintiff continued to state that he wanted witnesses, Barber replied, "Tell the folks

4

downtown." Barber then handed the disciplinary forms to Sgt. Carter, who watched the exchange between plaintiff and Barber.  (Doc. 72).

The next day, November 1, 2004, plaintiff saw defendant Barber again, while plaintiff was taking a shower.  He again told Barber that he wanted witnesses for his disciplinary hearing and that Barber was wrong for not noting his request for witnesses.  Barber responded, "That's my word against yours, go ahead and write them folks and tell them what you want." (Doc. 72).  Also on November 1, 2004, while on the exercise yard, plaintiff asked Sgt. Ryan (not a defendant) to notify Capt. Richburg that he wanted witnesses at his disciplinary hearing.  [Footnote]

> [Footnote: Plaintiff further stated that on November 2 or 3, 2004, Sgt Ryan confirmed that he had conveyed plaintiff's request to Capt. Richburg. While the *fact* that Sgt. Ryan said this to plaintiff is admissible evidence, it cannot be used to prove the truth of the assertion that Ryan actually conveyed the message to Richburg, because this would be inadmissible hearsay. The plaintiff cannot testify to an out-of-court statement by Ryan if it is offered to prove the truth of the matter asserted in the statement. Plaintiff has not offered the testimony of Ryan himself that the message was delivered to Richburg.]

Richburg denies ever receiving such notice or letter from plaintiff. (Doc. 71-8). [Footnote]

> [Footnote: The court notes that in Document 25, plaintiff offered certain exhibits, one of which is identified as a letter to Capt. Richburg, dated October 27, 2004, four days before the disciplinary notices were served on plaintiff. (Doc. 25, p. 7). This letter does not (and could not) refer to a purported denial of witnesses by Officer Barber because it was written before that event occurred. There is no other letter or writing to Capt. Richburg in the evidence before the court.

On November 2 or 3, 2004, plaintiff was taken before the Segregation Review Board for review of his administrative segregation status.  Prior to his disciplinary hearing and as a result of the stabbing, plaintiff was placed in administrative segregation [Footnote]

[Footnote: Administrative segregation is like disciplinary segregation in the sense that inmates are housed in one-man cells. It differs from disciplinary segregation in that its purpose is to separate inmates from the general population due to security reasons or because the inmate is in need of protection. Conditions in administrative segregation are not as harsh as those in disciplinary segregation. For example, administrative segregation inmates receive three meals a day; disciplinary segregation inmates receive no lunch. Administrative segregation inmates are allowed to keep their mattresses and have a radio, but disciplinary segregation inmates have their mattresses removed during the day and may not have a radio. Administrative segregation inmates have canteen (prison store) and telephone privileges, but disciplinary segregation inmates do not.]

for his protection.   A standard procedure is to review periodically the segregation status of inmates to assure that they do not remain in segregation longer than is necessary.   The warden sits as a member of the Segregation Review Board. At the Segregation Review Board meeting, plaintiff informed Warden Bullard that Officer Barber refused to note his request for witnesses at the upcoming disciplinary hearing.   Warden Bullard refused to review the disciplinary notices plaintiff attempted to show him, and he had the plaintiff escorted back to his administrative segregation cell.

On November 8, 2004, plaintiff was called before defendant corrections officer Trenton Eads for the hearing on the five disciplinary charges.  Plaintiff presented Eads with a request that he be allowed to call three witnesses or that the hearing be continued until the witnesses could be produced.  (Doc. 25, p. 8).  Eads denied both requests.  Plaintiff requested as witnesses inmate Roy Harvell and corrections officers Kerry Brewer and John Arthur.  (Doc. 39, p. 7).   During the course of the hearing, Eads called corrections officer John Arthur as a witness, but Brewer and inmate Harvell were not called.  Arthur was one of the three witnesses plaintiff had requested, and plaintiff was allowed to submit written questions to be asked of Arthur by the hearing officer. (Doc. 23-7, pp. 58-60).  Plaintiff alleges that Officer Arthur began circulating a rumor that plaintiff was a "snitch" informing the warden about inmates possessing contraband drugs.  He contends that Arthur did this in order to make plaintiff a target of other inmates and, in fact, in August 2004, plaintiff was attacked and stabbed in his cell. At the disciplinary hearing, Arthur was asked about the rumors and stated that he had seen a note written by plaintiff to another inmate in which plaintiff tried to solicit the inmate's

participation in a lawsuit against Arthur and the Department of Corrections. He also admitted at the hearing that plaintiff had requested that he make clear to other inmates that plaintiff was not a "snitch," but he denied ever accusing the plaintiff of being a "snitch."

The five disciplinary charges against plaintiff alleged violations for possession of contraband, creating a security hazard, bribery or attempted bribery, making false statements, and conspiracy.  As reflected on the disciplinary records (Doc. 23-7, pp. 6-67), plaintiff pleaded not guilty to each charge.  After the hearing, Officer Eads found plaintiff guilty of creating a security hazard because a cell search found plaintiff in possession of written materials that accused Officer Arthur of making false statements about him that resulted in him being stabbed by other inmates.  Similarly, Eads found plaintiff guilty of bribery or attempted bribery, and conspiracy, because the written materials included a note to another inmate in which plaintiff told the inmate how to testify against Arthur and, in return, plaintiff would "take care" of the inmate. Eads also found plaintiff guilty of making false statements in that the written materials discovered in plaintiff's cell falsely accused Arthur of telling other inmates that plaintiff was the "warden's snitch," causing plaintiff to get stabbed.  Finally, plaintiff pleaded guilty to possession of contraband in the form of gambling materials found among the papers in his cell.

Eads found plaintiff guilty of four of the five disciplinary charges and sentenced plaintiff to 45 days' segregation on each of the four (a total of 180 days) charges.  Eads then told plaintiff that he might as well plead guilty to the remaining disciplinary for possession of contraband gambling materials, and that Eads would only give him 21 more days for that offense.  Plaintiff agreed, pleaded guilty, and Eads sentenced him to another 21 days in segregation.  Plaintiff's total disciplinary sentence was 201 days in segregation.  [Footnote]

[Footnote: Plaintiff also lost certain privileges for visitation, canteen, and telephone.]

Because plaintiff is serving a sentence of life without the possibility of parole, he does not accrue good-time credits (Doc. 71-4), and, thus, his disciplinary sentence did not involve the loss of any good time.

On November 10, 2004, plaintiff appealed his disciplinary convictions and sentences to Warden Bullard, but they were affirmed. He then appealed

the convictions and sentences to former Commissioner of the Department of Corrections Donal Campbell, who affirmed them.

Alabama Department of Corrections Administrative Regulation 403, dated January 30, 2003, set out the procedures for disciplinary hearings on major violations at the time of plaintiff's hearing in November 2004. Section II, entitled "Due Process Requirements," states that "Any inmate charged with violation of departmental administrative regulations, institutional rules and regulations must be given a due process hearing if the violation can result in the loss of earned good time and/or confinement to segregation. An inmate can be placed in disciplinary segregation for up to 45 days and upon reclassification from work release for up to 30 days." (Doc. 39, p. 35). Among the due process procedural requirements, paragraph II.C. mandates that "The inmate must be permitted to call a reasonable number of reasonably available witnesses to the hearing, normally no more than three (3) witnesses." (Doc. 39, p. 35) Furthermore, paragraph III.F. states that the

> Serving Officer will obtain those names [of witnesses] at this time [when notice of the disciplinary is served on the inmate] and will not refuse to list any witnesses desired by the inmate. The Hearing Officer will determine if the witnesses' testimony could possibly be relevant and/or if bringing certain witness (es) [sic] would present a security threat.... The Hearing Officer may refuse to allow any witness whose testimony is not relevant to testify. (Doc. 39, p. 37).

If he had been called as a witness at plaintiff's disciplinary hearing, inmate Harvell could have testified that he and plaintiff were attacked and stabbed by two other inmates in August 2004. Further, he could have testified that in July, before the stabbing, he and plaintiff heard from other inmates that Officer Arthur had made statements to inmates that Harvell and plaintiff were "snitches," having turned in the names of some inmates for drug testing. Harvell and plaintiff asked Officer Arthur to "call out" the inmates and clarify that Harvell and plaintiff were not "snitches." Harvell could have testified that Arthur replied to this request, saying, "That shit's dead, just leave it alone." (Doc. 39, pp. 27-29).

There is no evidence before the court as to what corrections officer Kerry Brewer would have testified to if he had been called as a witness as requested by plaintiff. Plaintiff has testified that, after hearing rumors in July

2004 that Officer Arthur had identified him as the "warden's snitch," plaintiff sought the advice of Officer Brewer.  (Doc. 11, p. 9, ¶ 46).  He asked Officer Brewer to contact Arthur by radio to determine whether the rumors were true, but Officer Brewer found out that Arthur was on vacation, so apparently he never spoke to him.

(Doc. 81 at 4-9.)

## IV.  <u>DISCUSSION</u>

Having now carefully reviewed and considered *de novo* the report and recommendation, the objections to it, and all other matters in the court file, the court finds that, although one particular objection by defendant Bullard is due to be overruled, the objection by all of the defendants that the report and recommendation failed to consider whether the prior appellate decision was "clearly erroneous" and works "a manifest injustice" is well taken.  The court will reject the report and recommendation to the extent it recommends denial of the defendants' Motion for Summary Judgment, which will be granted.

*A. Bullard's Objection*

In addition to the objections also made by the remaining defendants, Warden Stephen Bullard has objected to a particular portion of the magistrate judge's report and recommendation concerned with Bullard's alleged failure to assist Moulds in securing the witnesses he wanted for his disciplinary hearing.  (Doc. 82 at 2.)  The magistrate judge found that, viewing the evidence most favorably to Moulds, Moulds complained to Bullard at a Segregation Review Board hearing on November 2 or 3, 2004 that he was being denied the

9

opportunity to call witnesses.  (Doc. 81 at 17-18.)  The magistrate judge stated that the only

evidence offered on this by Bullard was that he did not remember such a conversation with

Moulds.  (*Id.* at 17.)  Bullard now objects, saying that his testimony by affidavit was that he

did not respond to Moulds's complaint at the Board meeting because Moulds had waived his

right to call witnesses by refusing to sign the disciplinary notices presented to him on

October 31, 2004.  (Doc. 82 at 1-2.)

Regardless of whether the magistrate judge misconstrued the evidence, he clearly

rejected Moulds's argument that Bullard's failure or refusal to assist him at the Segregation

Review Board hearing constituted a due process violation.  The magistrate judge stated:

> Warden Bullard was not obligated to intervene in the disciplinary process at
> that time; indeed, as warden, his role under Administrative Regulation #403
> was to review the disciplinary procedures *after* the hearing.  To intervene in
> the process before the hearing would have upset the careful due process
> balance struck in *Wolff* and *Ponte* between the right of the inmate to request
> witnesses and the duty of the prison officials to assess the danger presented by
> such a request.  That balance was entrusted to the Hearing Officer, not Warden
> Bullard acting outside the procedures set up in Administrative Regulation
> #403.  To the extent, therefore, that plaintiff grounds his due process argument
> against Warden Bullard on his failure to respond to plaintiff's complaints at
> the Segregation Review Board, Warden Bullard did nothing to deny plaintiff
> any right he may have had to call witnesses.

(Doc. 81, p. 18.)  The basis of the magistrate judge's recommendation that Bullard's Motion

for Summary Judgment be denied was not his failure to intervene at the Segregation Review

Board hearing, but his failure to correct the alleged procedural deficiencies in the disciplinary

hearing when Moulds appealed from the result.  Thus, at least on this argument, the magistrate judge's report and recommendation is not due to be rejected or modified.

*B. Other Objections of Defendants*

The principal objection raised by all four defendants is the argument that the magistrate judge should have concluded that the mandate of the Eleventh Circuit in this case should be disregarded because it was "clearly erroneous" and following it would work "a manifest injustice."  (Doc. 82 at 4, 8.)  While the magistrate judge agreed that the appellate decision in this case was "clearly erroneous" on the question of whether Moulds was deprived of due process by the denial of witnesses, he also found that following the mandate would not work "a manifest injustice" sufficient to justify disregarding the mandate.  (Doc. 81 at 16, n.7.)  The defendants object, arguing that following the mandate does and will work "a manifest injustice."  (Doc. 82 at 4, 8.)

As the magistrate judge noted, the mandate rule, as an application of the law-of-the-case doctrine, requires the district court to follow the mandate of the appellate court, in letter and spirit, unless the facts or law changes in the interim, or unless the appellate decision is "clearly erroneous" and following it would work "a manifest injustice."  *See Piambino v. Bailey*, 757 F.2d 1112, 1120 (11th Cir. 1985); *United States v. Robinson*, 690 F.2d 869, 872 (11th Cir. 1982).  The Eleventh Circuit itself has explained the operation of the rule in this way:

> The "mandate rule," as it is known, is nothing more than a specific application of the "law of the case" doctrine. *Greater Boston Television Corp. v. Federal*

> *Communications Commission*, 463 F.2d 268, 279 (D.C.Cir.1971), *cert. denied*, 406 U.S. 950, 92 S.Ct. 2042, 32 L.Ed.2d 338 (1972); *City of Cleveland v. Federal Power Commission*, 561 F.2d 344, 348 (D.C.Cir.1977). This doctrine stands for the proposition that an appellate decision on an issue must be followed in all subsequent trial court proceedings unless the presentation of new evidence or an intervening change in the controlling law dictates a different result, or the appellate decision is clearly erroneous and, if implemented, would work a manifest injustice. *Westbrook v. Zant*, 743 F.2d 764, 768-69 (11th Cir.1984); *Baumer v. United States*, 685 F.2d 1318, 1320 (11th Cir.1982) (quoting *White v. Murtha*, 377 F.2d 428, 431-32 (5th Cir.1967)).
>
> The law of the case doctrine is not an "inexorable command," *White v. Murtha*, 377 F.2d at 431, but rather a salutary rule of practice designed to bring an end to litigation, *id.*, discourage "panel shopping," *Lehrman v. Gulf Oil Corp.*, 500 F.2d 659, 662 (5th Cir.1974), *cert. denied*, 420 U.S. 929, 95 S.Ct. 1128, 43 L.Ed.2d 400 (1975), and ensure the obedience of lower courts. *United States v. Williams*, 728 F.2d 1402, 1406 (11th Cir.1984). As with the mandate rule, the law of the case doctrine applies to all issues decided expressly or by necessary implication; it does not extend to issues the appellate court did not address. *Terrell v. Household Goods Carriers' Bureau*, 494 F.2d 16, 19 (5th Cir.), *cert. dismissed*, 419 U.S. 987, 95 S.Ct. 246, 42 L.Ed.2d 260 (1974); *Fogel v. Chestnutt*, 668 F.2d 100 (2d Cir.1981), *cert. denied*, 459 U.S. 828, 103 S.Ct. 65, 74 L.Ed.2d 66 (1982).

*Piambino*, 757 F.2d at 1120; *see also Allapattah Servs., Inc. v. Exxon Corp.*, 372 F. Supp. 2d 1344, 1364 (S.D. Fla. 2005) ("A district court may reconsider matters once decided under the following limited exceptions to the mandate rule: (1) new and substantially different evidence is presented in a subsequent trial; (2) there is an intervening change of controlling authority on the issue in question; or (3) the prior decision was clearly erroneous and would work manifest injustice") (citing *Heathcoat v. Potts*, 905 F.2d 367, 370 (11th Cir. 1990)). The third exception can be only rarely applied, or else the exception swallows the mandate

rule itself.  Only when the error in the appellate decision is beyond the scope of reasonable debate should the exception arise.  *See Allapattah Servs., Inc.*, 372 F. Supp. 2d at 1366 (citation omitted).  "The exception does not pose an invitation to engage in never ending argument.  It is reserved for the most 'cogent of reasons' in order to preserve the integrity of the judicial process."  *Id.*

Courts have put forth no categorical definition of "manifest injustice," instead finding it to result from clearly erroneous rulings on a discretionary basis depending on the facts of the case.  *See Culpepper v. Irwin Mortgage Corp.*, 491 F.3d 1260, 1276 (11th Cir. 2007) (affirming district court's de-certification of class and grant of summary judgment in RESPA suit where adhering to appellate court's previous ruling in favor of class certification, despite intervening conflicting policy statement from federal agency concerning RESPA liability and Eleventh Circuit case law adopting the policy statement, would be clearly erroneous and work manifest injustice); *Jenkins Brick Co. v. Bremer*, 321 F.3d 1366, 1371 (11th Cir. 2003) (Alabama district court's implicit ruling finding venue to be proper in Alabama held to be clearly erroneous and therefore not entitled to deference by Georgia district court where manifest injustice on employee would result from the potential use of Alabama law to uphold a non-compete agreement that was contrary to Georgia public policy).

Defendants argue that the court should disregard the mandate that remanded the case to this court for further proceedings with respect to Moulds's claim that he was denied witnesses at his prison disciplinary hearing in violation of his right to procedural due process

of law.  They focus on the third exception, that the appellate decision is clearly erroneous and works a manifest injustice.  (Doc. 82 at 4, 8.)  Reluctantly, the court agrees that the mandate must be disregarded.

For the reasons discussed at length in the magistrate judge's report and recommendation, (Doc. 81), this court finds that the decision of the court of appeals with respect to Moulds's due process right to witnesses at his disciplinary hearing is clearly erroneous.  The opinion contradicts itself, finding at one place that Moulds had no liberty interest sufficient to require due process, (Doc. 66 at 20-21), yet holding in another that his right to due process was violated when his requested witnesses were not called to his disciplinary hearing (*Id.* at 19).  In section e.  Due Process - Denial of Witnesses, the court of appeals held that Moulds had a right to call witnesses at his disciplinary hearing.  (Doc. 66 at 19.)  Next, in section f.  Due Process - Disciplinary Confinement, the court held that "the conditions of Moulds's disciplinary confinement are not of constitutional dimensions." (*Id.* at 20.)  Thus, as the magistrate judge noted, "The [court of appeals'] opinion seems to hold, simultaneously, that plaintiff had no right to procedural due process of law with respect to the disciplinary hearings that resulted in his confinement to segregation, yet the denial of the opportunity to call witnesses during those hearings violated procedural due process." (Doc. 81 at 10.)

In holding that Moulds had a right to present witnesses at his disciplinary hearing, the court of appeals relied on *Wolff v. McDonnell*, 418 U.S. 539 (1974), and *Ponte v. Real*, 471

14

U.S. 491 (1985).  (Doc. 66 at 17-19.)  *Wolff* outlined certain procedural due process requirements, including the inmate's right to call witnesses in his defense, for the disciplinary hearing of an inmate who faced the loss of good-time credits if convicted.  418 U.S. at 556-57, 563-68.  Before discussing the minimum due process required in such a context, the Court noted that the inmate is not entitled to "the full panoply of rights" due a criminal defendant, but rather the inmate's rights are restricted "by the nature of the regime to which [he has] been lawfully committed."  *Id.* at 556.  The Court then explained that, in the particular context of the case, the inmate was entitled to a certain degree of due process because of the liberty interest at stake in the forfeiture of good-time credits.  The Court explained:

> [T]he State having created the right to good time and itself recognizing that its deprivation is a sanction authorized for major misconduct, the prisoner's interest has real substance and is sufficiently embraced within Fourteenth Amendment 'liberty' to entitle him to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state-created right is not arbitrarily abrogated.

*Id.* at 557.  Loss of good time was also at issue in the disciplinary hearing of the inmate in *Ponte*.  471 U.S. at 495.  Unlike the *Wolff* and *Ponte* courts, however, the court of appeals did not identify any liberty interest at stake in Moulds's disciplinary hearing.  As the magistrate judge noted, "Relying on *Wolff* and *Ponte*, the court of appeals seemed to assume that the disciplinary hearings plaintiff received implicated a right to procedural due process

of law, and held the denial of witnesses during the hearing violated due process." (Doc. 81 at 10.)

However, the court of appeals rejected Moulds's due process claim with respect to the conditions of the confinement imposed on him as a result of his disciplinary convictions. (Doc. 66 at 20.)  Relying on *Sandin v. Conner*, 515 U.S. 472 (1995), the court held that Moulds's disciplinary segregation for 201 days did not give rise to a right to procedural due process.  The court of appeals wrote:

> The Supreme Court has held that "the Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement," but that "a liberty interest in avoiding particular conditions of confinement may arise from state policies or regulations, subject to the important limitations set forth in *Sandin v. Conner*, 515 U.S. 472. . . ." *Wilkinson v. Austin*, 545 U.S. 209, 221-22 (2005).  "After *Sandin*, . . .the touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is not the language of regulations regarding those conditions but the nature of those conditions themselves in relation to the ordinary incidents of prison life." *Id.* at 223 (quotations omitted).  Temporary withdrawal of visitation privileges for disciplinary purposes is "not a dramatic departure from accepted standards for conditions of confinement," but a claim of permanent or extended withdrawal of all visitation privileges "would present different considerations." *Overton v. Bazzetta*, 539 U.S. 126, 136-37 (2003).

> As applied here, the conditions of Moulds's disciplinary confinement are not of constitutional dimensions.  His temporary loss of privileges does not rise to the level of a protected liberty interest.  *See Overton*, 539 U.S. at 136-37.  Although he was deprived of one meal per day, he has not alleged facts showing that his diet, taken as a whole, was inadequate.  He also alleged that he was deprived of a mattress for approximately half of each day, but he did not allege that he was not allowed to sleep on a mattress.  Under the circumstances, particularly in proportion to the length of Moulds's sentence, the 201 days he spent in segregation and subject to these conditions did not constitute such a 'dramatic departure' from ordinary prison life as to give rise

16

to a protected liberty interest.  *See id.*  Accordingly, the district court did not err in denying this claim.

(Doc. 66 at 20-21.)  Although the court of appeals explicitly finds here that Moulds's imposed confinement did not implicate a liberty interest, the court of appeals nonetheless also holds that Moulds was entitled to the protections of procedural due process at his disciplinary hearing.

In his report and recommendation after remand, the magistrate judge explained the inconsistency behind the court of appeals' rulings.  The magistrate judge wrote:

> It is hard to understand how the court arrived at both of these conclusions, that the plaintiff had no right to procedural due process of law with respect to disciplinary segregation or loss of privileges, while also holding that the denial of witnesses at the disciplinary hearings violated due process.  Certainly, if plaintiff had no cognizable right to due process in the hearing, any deficiencies in the procedures by which the hearing was conducted cannot be said to violate due process.  It would seem apparent that, if plaintiff had no liberty interest in avoiding disciplinary segregation and, thus, no right to a due process hearing before being confined in segregation, deficiencies in the manner in which the hearing was held also could not give rise to a violation of a constitutional right to due process. Certainly, the mere fact that the Department of Corrections' Administrative Regulation 403 provided the inmate with the right to call witnesses does not mean that the Due Process Clause of the Constitution is implicated.  A violation of a state agency's own procedures does not itself make out a constitutional violation.  *See First Assembly of God of Naples, Florida, Inc. v. Collier County*, 20 F.3d 419, 422 (11th Cir. 1994); *Harris v. Birmingham Board of Education*, 817 F.2d 1525, 1527-1528 (11th Cir. 1987); *Austin v. City of Montgomery*, 353 Fed. Appx. 188, 191 (11th Cir. 2009) ("The violation of a state statute that does not create a liberty or property interest cannot be the basis for a due process claim.").

17

(Doc. 81 at 11-12.)  The magistrate judge goes on to explain why the court of appeals should have relied on *Sandin*, rather than *Wolff* or *Ponte*, in its analysis of Moulds's procedural due process claim.  The magistrate judge wrote:

> Following *Sandin*, both *Wolff* and *Ponte* are distinguishable on the ground that those cases involved the loss of good time credits, something not possible in this case.  A fair reading of *Sandin*, *Wolff*, and *Ponte* leads to the conclusion that, while disciplinary segregation and loss of privileges are not "atypical" conditions compared to the ordinary incidents of prison life and, therefore, do not implicate due process, the potential loss of good time credits, and the resulting *lengthening* of the time the inmate must remain in prison, does implicate due process because, plainly, a prisoner has a liberty interest in being released from prison in accordance with his sentence.  As the Supreme Court explained in *Wilkinson v. Austin*, 545 U.S. 209, 125 S. Ct. 2384, 162 L. Ed. 2d 174 (2005):
>
>> The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake.  A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word "liberty," *see, e.g.*, *Vitek v. Jones*, 445 U.S. 480, 493-494, 100 S. Ct. 1254, 63 L. Ed. 2d 552 (1980) (liberty interest in avoiding involuntary psychiatric treatment and transfer to mental institution), or it may arise from an expectation or interest created by state laws or policies, *see, e.g.*, *Wolff v. McDonnell*, 418 U.S. 539, 556-558, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (*liberty interest in avoiding withdrawal of state-created system of good-time credits*).
>>
>> We have held that the Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement.  *Meachum v. Fano*, 427 U.S. 215, 225, 96 S. Ct. 2532, 49 L. Ed. 2d 451 (1976) (no liberty interest arising from Due Process Clause itself in transfer from low-to maximum-security prison because "[c]onfinement in any of the State's institutions is within the normal limits or range of custody which the conviction has authorized the State to

18

impose"). We have also held, however, that a liberty interest in avoiding particular conditions of confinement may arise from state policies or regulations, subject to the important limitations set forth in *Sandin v. Conner*, 515 U.S. 472, 115 S. Ct. 2293, 132 L. Ed. 2d 418 (1995).

*Id.* at 221-222. The critical factor operating in *Wolff* and *Ponte* was the fact that the discipline imposed on the prisoner involved the loss of good time credits, which resulted in increasing the actual time the inmate had to remain in prison. That was not true in either *Sandin* or the instant case. In this case, plaintiff is serving a sentence of life without the possibility of parole. For that reason, not only does he not qualify under Alabama law to accrue good time, such would be meaningless in any event because he will not and cannot be released from prison.

The decision of the court of appeals in this case seems to inject a due process consideration into prison disciplinary procedures even though no liberty interest is at stake. The court of appeals itself found that Moulds had no right to due process with respect to placement in disciplinary segregation, yet still required, as an element of procedural due process, that he be guaranteed the presence of requested witnesses at the disciplinary hearing. This seems to confuse the rationales of *Sandin*, where no liberty interest was at stake in the placement of the inmate in disciplinary segregation, and *Wolff* and *Ponte*, where a liberty interest in accrued good time credits was at stake.

(Doc. 81 at 11-14.)

The court agrees with the magistrate judge and the defendants that it is impossible to reconcile these two holdings of the court of appeals. If it is true (as this court and the court of appeals found) that placing Moulds in disciplinary segregation for 201 days was not sufficiently "atypical" of ordinary prison conditions to give rise to a protected liberty interest, the absence of a cognizable liberty interest meant that Moulds had no right to procedural due process before being put into segregation. *See Sandin*, 515 U.S. at 484. His placement in segregation did not deprive him of a cognizable liberty interest. Indeed, this is one of the

19

holdings of the court of appeals's decision in this case. (Doc. 66 at 20-21.) But if Moulds had no right to procedural due process at all, it must follow logically that defects and deficiencies in the disciplinary hearing could not be violations of Fourteenth Amendment due process. Surely a viable claim cannot be grounded on a right that does not exist in the context of this case. Yet, that seems to be another holding of the court of appeals. (*Id.* at 19.)

The court is convinced that the decision of the court of appeals is "clearly erroneous" for the very reason that these two holdings cannot co-exist peacefully. One of them must be wrong. The magistrate judge carefully set out the reasons for believing that *Sandin v. Conner*, not *Wolff v. McDonnell*, is the correct foundation for the legal analysis of Moulds's due process claim. (Doc. 81 at 9, 11-14.) The liberty interest at stake in *Wolff*, one that was sufficient to create a right to due process, was the potential loss of good-time credits toward release from prison. 418 U.S. at 557; *cf. Baker v. Rexroad*, 159 Fed. Appx. 61 (11th Cir. Oct. 20, 2005) (no liberty interest at stake where inmate faced loss of 60 days of gain time as a result of disciplinary hearing). That is not true in this case, nor was it true in *Sandin*. The right to procedural due process in the prison disciplinary context usually turns on that distinction. Where no right to good-time credits is implicated, *Sandin* instructs courts to determine whether the punishment imposed on the plaintiff is "atypical" of what other prisoners experience as ordinary incidents of prison life. 515 U.S. at 484. *Sandin* makes clear that there is no liberty interest in avoiding transfer to a harsher, more restrictive

20

custody, as long as that custody is not "atypical" of what can be expected as an incident of ordinary prison life. *Id.*; *see also Wilkinson v. Austin*, 545 U.S. 209, 223 (2005); *Smith v. Sec'y, Fla. Dept. of Corr.*, 358 Fed. Appx. 60, 63 (11th Cir. Dec. 21, 2009) (citation omitted). In this case, this court and the court of appeals agreed that Moulds's 201-day disciplinary segregation custody was not atypical and, thus, did not implicate any liberty interest sufficient to trigger a right to procedural due process. Contrary to this conclusion that no due process right existed, however, the court of appeals also held that Moulds was deprived of his due process right to call witnesses at his disciplinary hearing. (Doc. 66 at 16.) This court is convinced that this is an erroneous application of *Wolff* to a factual circumstance missing the crucial element of the liberty interest that existed in *Wolff*, namely, the right to good-time credits.

In their objections to the report and recommendation, the defendants contend that the magistrate judge failed to adequately consider whether this error would result in a "manifest injustice," which would allow the court to apply the third exception to the mandate rule and disregard the mandate of the court of appeals. The court agrees with defendants. The error discussed above not only exposes these defendants to potential monetary liability under clear and undisputed facts that do not support such liability, but it also has wide-ranging consequences for the Alabama Department of Corrections in the handling of prisoner disciplinary matters. Though the appellate opinion in this case was unpublished, it is still known to the Alabama DOC, and therefore must be taken into account in the future. What

21

once was a clear and easily administered distinction between *Wolff* and *Sandin* is now muddled, and this muddle directly impacts the manner in which the Alabama DOC must carry out one of its basic functions — administering prisoner discipline to maintain order in its prisons.  Thus, the "manifest injustice" hits not only these individual defendants before the court, but also the entire Alabama prison system, creating confusion and unnecessary administrative burdens.

For these reasons, therefore, the court will, by separate order, reject the magistrate judge's second report and recommendation to the extent that it recommends denying summary judgment to defendants Barber, Eads, and Bullard.[2]  The court will grant summary judgment to these defendants because, as the court of appeals explained in section f. of its opinion, Moulds had no liberty interest in avoiding transfer to disciplinary segregation and, thus, had no right to procedural due process.  There being no such right, any failure to call witnesses to his disciplinary hearing did not deprive him of a Fourteenth Amendment due process right.  Consequently, these defendants are entitled to summary judgment on the claim that their failure to summon Moulds's witnesses to the disciplinary hearing violated his right to procedural due process.

---

[2]  Because the magistrate judge recommended that summary judgment be granted to defendant Richburg, the court will adopt and accept that part of the report and recommendation.

22

DONE this 30th day of September, 2010.


SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE